MICHAEL MANNING vs. STATE OF CONNECTICUT.

MALTBIE, C. J., HINMAN, AVERY, BROWN and JENNINGS, Js.

Argued October 6th—decided December 21st, 1937.

*Edward G. Mag,* for the appellant (plaintiff).

*Richard F. Corkey,* Assistant Attorney General, with whom, on the brief, was *Charles J. McLaughlin,* Attorney General, for the appellee (defendant).

HINMAN, J. The plaintiff claims workmen's compensation from the State on account of injuries sustained while working on a building being erected in New Britain as a work relief project, under the circumstances hereinafter recited.

Among the laws enacted by Congress which were designed to relieve the situation created by economic depression was an act, approved May 12th, 1933, "To provide for co-operation by the Federal Government with the several States and Territories and the District of Columbia in relieving the hardship and suffering caused by unemployment, and for other purposes." 48 U. S. Statutes at Large, Part 1, p. 55. This act is generally known as the Federal Emergency Relief Act and referred to as FERA. In § 5 it provided that in order to obtain federal funds under this act the application therefor should show provisions of suitable standards of relief and to assure adequate administrative supervision of the use of the funds for the purposes for which they were requested. By virtue of authority under the act, the federal emergency relief administrator promulgated certain rules and regulations for carrying it into effect, which included provisions that "Federal relief money reaches the needy individual or family through local public relief agencies which are supervised by the State relief administrations;" that "the amount of relief is based on the family or individual budgetary need to be determined by careful investigation by trained social workers . . .;" that "where skilled personnel is required, skilled wages for skilled work must be paid. Such personnel taken from work relief lists should be staggered. Where such skilled personnel is required full time it should be provided otherwise than on a work relief basis;" also that "relief workers are not Federal employees," and that "persons employed on work relief projects

should be covered by compensation and accident insurance" which may not be paid from federal funds but must be carried by state or local moneys. There was also a requirement that adequate provision be made for the safety of employees.

In order that Connecticut might take advantage of that act the General Assembly passed an act (General Statutes, Cum. Sup. 1933, Chap. 32A), effective June 7th, 1933, creating a state emergency relief commission, hereinafter referred to as the commission. It was provided therein (§ 80b) that the commission should serve without compensation, but be allowed its actual and necessary expenses, and "may employ such assistants as may be required in the performance of its duties, whose compensation shall be determined by the board of finance and control and shall be paid by the state," and an appropriation of $10,000 was made therefor (§ 87b). The commission was authorized (§ 82b) to make and enforce rules and regulations to promote the efficient and effective use of all money made available to cities and towns for work or home relief. "Work relief" was defined (§ 79b) to mean "wages paid by a city or town from money specifically appropriated for the purpose or from money provided by the federal government or any agency thereof to persons unemployed or whose employment is inadequate to provide the necessities of life, or to the dependents of such persons, or from money contributed for the purpose by the public for the performance of services or labor connected with work undertaken by such city or town independent of work under a contract or for which an annual appropriation has been made." "Home relief official" was defined to mean the superintendent of charities or other chief administrative unemployment relief agency of a municipality of this State, and "relief committee" to mean the local

unemployment relief committee approved by the commission in any municipality of this State. It was provided in § 82b that "the commission may require any home relief official or relief committee to submit to it information showing the amounts necessary to meet local relief needs, the amounts available from public or private sources to meet such needs, the provisions made to assure adequate local administrative supervision, the provisions made for suitable standards of relief, the purpose for which relief funds are being used and such other information as the commission may specify." The commission was (§ 85b) "designated as the administrative agency of the state to apply for financial or other aid for emergency, industrial or unemployment relief purposes which the United States government has authorized or may authorize to be given to the several states. . . . The state treasurer is directed to receive all money granted by the United States or by any agency thereof and to hold the same separate from all other funds of the state. Such funds shall be disbursed by the treasurer, upon voucher of the comptroller, under direction of and subject to the rules and regulations of the commission. Such money shall be distributed or such other aid shall be administered by the commission for emergency relief in the state."

In the city of New Britain, with the approval of the commission, the board of public welfare of the city acted as the local relief committee, the chairman of that board as the local relief administrator, and John L. Doyle, the superintendent of the department of public welfare, as the acting administrator. Relief workers were selected, under the regulations of the commission, from eligible lists prepared by, and in conformity with the budgetary requirements set by, case workers in the employ of the public welfare de-

partment of New Britain, and the local relief committee and the acting local administrator had authority to direct their work, certify the payrolls and distribute the pay checks.

The commission applied to the federal government for an allotment or grant of financial aid to relieve the unemployment situation in this State and an allotment was thereafter made. The money furnished by the federal government was delivered to the state treasurer, kept in a special fund and applied to the specific purpose for which it was appropriated. Recipients of work relief were paid by check from the office of the state treasurer, the checks and payrolls designating the recipients as relief workers and not as regular employees, and the checks were issued on "account of emergency relief administration," were signed by the state comptroller, and for relief workers in New Britain bore the indorsement "Issued on account of Federal Emergency Relief Administration Fund allocated to Town of New Britain for local relief in said town." In addition to relief workers, the commission engaged the services of a sufficient number of persons to properly administer the funds coming into its possession. These workers were known as "non-relief" workers and were paid regular salaries by checks issued from the office of the state treasurer and marked on the payroll as non-relief workers. These persons included, among others, supervisors, foremen, and necessary skilled workers who were not obtainable from relief rolls or under the usual relief regulations. The commission, with the approval of the federal administrator, ordered that at least 90 per cent. of the payroll employed on any project should be in need of relief and that not more than 10 per cent. should be otherwise engaged.

In April, 1934, the local emergency relief adminis-

tration of the city of New Britain applied to the commission for an allotment of federal funds to assist in the erection of a public warehouse on Harvard Street in that city and approval thereof was granted. The claimant, a resident of New Britain, had applied for relief to the city welfare department, was eligible for work relief, and was assigned to work on that warehouse. It was determined by investigators that his family needs required a budgetary allotment of $11 per week. He was an experienced iron worker and under FERA regulations was entitled to the prevailing wage for iron workers, which was $1.37½ per hour, or $11 for each eight-hour day, so that, according to the regulations, he could be employed as a relief worker but one day each week. However, the local emergency relief committee was anxious that the iron work be rushed in order to prepare the subsequent building operations for the employment of relief workers and, there being only four iron workers available for work relief at the time, a request was made, and granted by the commission, that the iron workers be permitted to work more than one day per week, but it was understood and agreed that they would be paid each week for only one day and would be credited and thereafter paid for the other days' work at the rate of one day per week until the credit was exhausted, so that each would not receive for any week from FERA funds more than his budgetary allowance. During the week ending June 2d, 1934, the plaintiff worked four days, in the week ending June 9th, five days, and in the week ending June 16th, four days, but he was actually allowed on the payroll and paid only $11 for each of these weeks.

On the morning of June 18th the plaintiff fell, striking his back and injuring it so seriously that he was totally disabled for two years and will be 20 per cent.

permanently disabled. He filed a claim for compensation against the city of New Britain, but the acting compensation commissioner for the first district held that he was not an employee of the city in such manner and form as to entitle him to compensation, dismissed the claim, and no appeal was taken. Thereafter this claim was made for compensation from the State. The attorney general having advised (Report of Attorney General, 1933, 1934, p. 283) that persons receiving relief under the FERA were not employees of the State within the meaning of the Compensation Act, the State secured no compensation insurance covering such claims, and the commission announced that on the basis of the opinion of the attorney general it would assume that "relief workers" were not entitled to compensation under the Workmen's Compensation Act but that the commission would nevertheless set up a reserve of 1 per cent. of payroll to pay for accident costs and would thereafter make payments to injured relief workers on the basis of their budgetary requirements. The commission did, accordingly, set aside for that purpose 1 per cent. of the federal funds coming into its possession, under FERA administration, and up to the date of the hearing had regularly paid the plaintiff and he had accepted a budgetary allowance ranging from $8.25 to $11 per week, also paid his hospital and medical expenses, and, further, delivered to the city of New Britain the sum of $600 to take care of further needs of the plaintiff during the life of the Emergency Relief Commission Act, expiring February 1st, 1937.

Upon the facts found by him, the commissioner held that "the sole function of the State in the matters here involved was to aid the federal government, and as the latter's representative, see that federal funds were properly administered and delivered to

those entitled to them on a relief basis. No contract of employment, within the meaning of the Workmen's Compensation Act, was ever entered into between the respondent and the claimant, and the claim must, therefore, be dismissed."

Due consideration of the assignments pertaining to the finding confirms the ruling of the Superior Court that no further corrections material to the result are called for by the evidence. The principal controversy between the parties in this court related to the validity of the conclusions above stated. As to the scope of the functions of the State in the premises, the Connecticut act (General Statutes, Cum. Sup. 1933, Chap. 32A), as indicated by the excerpts we have quoted, was obviously only intended to make effective the provision for administrative supervision of the distribution of the federal funds. It provided for and contemplated no expenditure by the State except for the expenses of the commission including pay of such assistants as it required in the performance of its duties, and the amount of the appropriation made therefor ($10,000) indicates that only necessary assistants to the commission itself were intended to be so paid. The finding shows that local supervision and administration of work relief was paid for out of federal funds, with the approval of the federal administrator. The facts as to the scope and nature of the activities of the State and the commission under the act appear to be in harmony with this conception—that the functions of the commission intended and exercised were limited to such administration of the federal funds as would satisfy the requirements of the federal act in safeguarding their proper distribution and efficient use for the purposes intended.

We find it unnecessary to decide whether, notwithstanding, there was a contract or relationship of em-

ployment between the State and the plaintiff such as to bring them within the operation of the Workmen's Compensation Act. As above stated, it appears that for a period of more than two years the plaintiff received and accepted a weekly allowance from the reserved fund set up by the commission, and in addition had the benefit of the payments from that fund of his medical and hospital expenses and the large lump sum payment to the city for his future use. He now claims, from the State, the payments provided by the Workmen's Compensation Act. As the commissioner rested his decision upon his conclusion that the plaintiff was not within the scope of the act, he has not found in detail the extent of the disability the plaintiff suffered, beyond the fact that he was totally disabled for a period of two years and will suffer a permanent disability of 20 per cent. Under the Workmen's Compensation Act in effect at the time of his injury he would be entitled to receive, from date of the injury and so long as the total disability continues, one-half his average weekly earnings and when his disability becomes partial instead of total one-half of the difference between his average weekly earnings before his injury and the amount he is able to earn thereafter, both subject to certain limitations as to time and amount (General Statutes, §§ 5236, 5237), also his reasonable medical and surgical expenses. General Statutes, § 5232. It was claimed on behalf of the plaintiff that his average weekly earnings prior to the date of his injury were $50.64 and that he was entitled to compensation at the rate of $21 per week. There is no way by which the amount the plaintiff has received from the reserved fund could be set off against an amount found due him for compensation or by which the reserved fund could be reimbursed from any amount awarded the plaintiff as compensation.

The commission, believing that the State was not liable to pay compensation under the Workmen's Compensation Act, set up the reserved fund as a substitute method of compensating for disability due to injuries, and that was the purpose of the payments made to and for the plaintiff from it. Such payments were really of the same nature as the payments he would receive under the Compensation Act. If also awarded compensation under the latter, the plaintiff would, in effect, receive double compensation for his disability. Such a result is foreign to the theory of the Workmen's Compensation Act as appears from its provision that if an injury is sustained under circumstances creating in some other person than the employer a legal liability to pay damages the employer is entitled to reimbursement from any sum recovered as a result of that liability to the extent of the payments he has made. General Statutes, § 5231. To permit the plaintiff, having received compensation for his injury from the reserved fund, now to secure an award under the Compensation Act would be to accomplish a purpose which that act was never intended to serve, and permit him to obtain both payments from the reserved fund and his workmen's compensation when one was intended by the State as a substitute for the other.

If the plaintiff be right in his contention that he was an employee of the State within the Workmen's Compensation Act, he could have at once applied to the compensation commissioner for an award. He did not do that, but voluntarily chose to avail himself of the benefits of the reserved fund. The two rights he had were wholly inconsistent; payments under the reserved fund were based upon the assumption that he was not an employee under the Workmen's Compensation Act, while his present proceeding is based upon

the claim that he was such an employee. His acceptance of benefits of substantial payments from the reserved fund constituted an election from which he cannot now withdraw. *Butterfield* v. *Brady*, 111 Conn. 112, 114, 149 Atl. 252; *Berman* v. *Apter*, 95 Conn. 66, 68, 110 Atl. 453; *Dean* v. *Connecticut Tobacco Corp.*, 88 Conn. 619, 626, 92 Atl. 408; 9 R. C. L. 960; *Fox* v. *Wilkinson*, 133 Wis. 337, 113 N. W. 669, 14 L. R. A. (N. S.) 1107; 20 C. J. 20. Election means the making of an act of choice between two or more courses of conduct and implies that the act was done under such circumstances that the choice is binding. *Usher* v. *Waddingham*, 62 Conn. 412, 428, 26 Atl. 538.

There is no error.

In this opinion the other judges concurred.