PATRICK H. DONNELLY'S (dependent's) CASE.

Plymouth.    October 6, 1939. — December 19, 1939.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, & COX, JJ.

*Workmen's Compensation Act,* To whom act applies. *Municipal Corporations,* Officers and agents. *Agency,* What constitutes.

A laborer working on a construction project in a city cemetery, hired and assigned to his work by the local Federal emergency relief administrator, subject to discharge by him only and paid by the Federal government, was not working under a contract "of hire" with the city, "express or implied, oral or written" and therefore was not its employee within G. L. (Ter. Ed.) c. 152, § 1 (4), although the project was for the benefit of the city and was supervised by its cemetery superintendent.

CERTIFICATION to the Superior Court of a decision by the Industrial Accident Board awarding compensation.

The city of Brockton appealed· from a decree entered by order of *J. W. Morton,* J., in accordance with the board's decision.

The case was submitted on briefs.

*J. N. Maguire,* City Solicitor, for the city of Brockton.

*T. W. Prince,* for the claimant.

DOLAN, J.    This is a workmen's compensation case. The claimant is the widow of Patrick H. Donnelly (hereinafter referred to as the deceased) who suffered injuries on February 9, 1935, while working in the public cemetery of the city of Brockton (hereinafter described as the city), as a result of which he died on February 16, 1935.    The single member of the Industrial Accident Board found for the claimant, and, upon review, the reviewing board adopted her findings and affirmed her decision.    The case comes before us upon an appeal from the decree entered in the Superior Court in accordance with the findings of the board.

The sole question for determination is whether the deceased at the time of the injury which resulted in his death

was an employee of the city within the meaning of the workmen's compensation act (G. L. [Ter. Ed.] c. 152, § 1 [4]).

The findings of fact of the single member adopted by the board follow: "Upon all the evidence I find that A. J. Masefield, the city engineer of the city of Brockton, drew up certain specifications and figured the cost of labor and material for improvement in the Melrose Cemetery, a public cemetery owned by the city of Brockton. This project consisted of enlarging the burial area, constructing roadways and pathways throughout this new area, grading area previously developed by welfare workers during the summer of 1932. After the plans and specifications were prepared, Horace C. Baker, mayor of the city of Brockton, and John P. Murphy, the local administrator of the E. R. A., signed the application to the Federal emergency relief administration for approval of the moneys necessary to cover the cost of labor for the project above described, which was sponsored by the trustees of the Melrose Cemetery. The money necessary to cover the cost of labor was to be furnished by the Federal government and the trucks, tools, materials and other appliances to be furnished by the city of Brockton. It was understood that the amount expended in labor would be paid to no man who could not be classified and assigned to the job as a relief worker. Arrangements were made to advance the money to the city through its local administrator, John P. Murphy, who was also director of public welfare for the city of Brockton and a member of the board of public welfare. It was his duty as local E. R. A. administrator to see that the rules and regulations set forth by the Federal government were complied with. The deceased employee had never been on the relief rolls of the city of Brockton and was never aided or assisted by the city, but it was agreed that if he had not been employed on this job it would have been necessary for him to receive relief from the city of Brockton. Therefore he was accepted as a relief worker and classified by the E. R. A. administrator as a laborer, under which classification he began work. The superintendent of the Melrose Cemetery, Herbert Snow, was in charge of the work and was responsible

for the supervision of it. I am also satisfied and find that this cemetery project was laid out by the trustees of the Melrose Cemetery, through the city engineer, managed and supervised by the superintendent of the Melrose Cemetery, Herbert Snow, and that all benefits from the project enured to the city of Brockton, the only interest the Federal government having [*sic*] was to see that the project was carried out in accordance with the terms of the application and that the persons assigned to the work were relief workers. According to the application, which is made a part of this record, the project was to be supervised by the said Herbert Snow, superintendent of the Melrose Cemetery. I find that the deceased was an employee of the city of Brockton and that on February 9, 1935 while so employed he was struck in the stomach by a sledge hammer, which was part of the equipment furnished by the city to carry on the work of the project, and was removed to the Brockton Hospital where he died on February 16, 1935, as a result of internal injuries. I find that this was a personal injury arising out of and in the course of his employment. I find that the claimant, Annie I. Donnelly, was living with the deceased at the time of his injury and death and is conclusively presumed to be dependent upon him for support." These findings were followed by an order for the payment of compensation to the claimant.

While the findings of fact of the Industrial Accident Board will not be reversed if there is evidence to sustain them, *Gates's Case*, 297 Mass. 178, and cases cited, and there was evidence here to sustain most of the subsidiary findings of the board, we are of opinion not only that the subsidiary findings do not warrant the ultimate finding that the deceased was an employee of the city within the meaning of the workmen's compensation act, but also that the reported evidence does not warrant that ultimate finding.

There was evidence that the project in question was sponsored by the city and approved by the local "E. R. A." administrator and by the approving officer of the State "E. R. A." The project was to be supervised by the super-

intendent of the Melrose Cemetery, which was in the control of a department of the city. The local E. R. A. administrator from September, 1934, through February, 1935, was also an employee of the board of public welfare of the city over the same period of time. There was also evidence that the Federal government, through the Federal emergency relief administration, furnished a total of $10,190.40 for labor upon said work project; that the men employed on the work project, including the deceased, came from the office of the local E. R. A. administrator, and were regular residents of the city; that those who got jobs in connection with the work being done on the Federal project made an application to the administrator of the local E. R. A.; that if they were in need of a job or were welfare or aid cases, their names were placed on the administrator's files; that the deceased was thus assigned to the work involved; that after the list of names, including the name of the deceased, was furnished, the administrator of the local E. R. A. had nothing to do with the selection of the materials to be used, or of the equipment, tools and appliances needed in the performance of the cemetery work project; and that the only time that the Federal inspectors appeared upon the job was when the engineers came to see if the particular project was going forward in accordance with the plans and specifications agreed upon.

The local administrator visited the cemetery many times; "he wanted to see if the men [assigned by him] were doing a fair day's work." He gave no instructions at any time with reference to the details of the work, "except he told the foreman on the job if there were men who would not work to send them back to him." The superintendent of the cemetery, who was supervisor of the project, was not the "responsible local government officer, he was a supervisor, the supervisor wouldn't necessarily have much authority." The local administrator "assigns men to particular jobs . . . such as laborers, timekeepers." The supervisor could not change a laborer to a timekeeper without the approval of the local administrator. The latter classified the men assigned as "laborers, timekeeper, foreman,

water boys." No one but the local administrator had the records of the men assigned, "and no one else could decide to what job they would be assigned."

The supervisor from time to time instructed the foremen with reference to the manner in which the work was to be done. "The men came from . . . [the local administrator's] office" and the supervisor put them to work. "He knew whether they were laborers, timekeepers ·or foremen because they had a slip saying what they were and the slip went to the foreman on the job." The supervisor "at no time let any person off that job. In the event that a person . . . failed to do his work . . . [the supervisor] would have sent him back to . . . [the local administrator]; . . . would have told that person to go down and see . . . [the local administrator]." As far as specifying people to go to work on the job the supervisor had nothing to do with it. He hired no one to go to work on the job. "At various times Federal officials came . . . [to the cemetery] to see how the project was getting along; they didn't make any recommendations . . . ."

The deceased worked on the project as a laborer from September 12, 1934, to February 9, 1935, both inclusive, "three days each week, eight hours per day at fifty cents per hour," receiving each week $12, which was paid to him each week by checks issued by the treasury department of the United States and disbursed to him by the local agents of the Federal emergency relief administration. He was not otherwise employed during said period. Most of the evidence just recited consisted of agreed facts. None of the evidence presented by the testimony of witnesses was disputed.

The evidence discloses that the deceased was hired by the representative of the Federal government; that he was classified as a laborer by the representative; that this classification could not be changed by the superintendent of the cemetery; that the latter could neither hire nor discharge the deceased; that the work involved was inspected from time to time by inspectors of the Federal government in order to see that the work was going forward in accord-

ance with specifications approved by the E. R. A. officials; that the local administrator visited the scene of the work frequently to see that the men assigned were doing a fair day's work; and that the foreman "on the job" was under instructions of the local administrator to send back to him men who would not work.

By § 1 (4) of G. L. (Ter. Ed.) c. 152 (the workmen's compensation act), the word employee, with certain exceptions not here material, is defined as "every person in the service of another under any contract of hire, express or implied, oral or written . . . ." Testing the status of the deceased by the terms of this definition, we think it is clear that neither the subsidiary findings of the board nor any of the evidence warrants the conclusion that the deceased was an employee of the city at the time of his injury, in so far as that conclusion of the board may have been rested upon a view that between the deceased and the city there existed at the time of his injury a contract of hire "express or implied, oral or written." The relation of employer and employee is commonly spoken of throughout the law under the description of master and servant except that to be an employee as distinguished from a servant, generally, one must serve under a contract of hire. *McDermott's Case*, 283 Mass. 74, 75–76, and cases cited.

Even if in some circumstances evidence of direction and control over a workman might in itself be sufficient to warrant a finding of a contract of hire (*Chisholm's Case*, 238 Mass. 412; *Wall's Case*, 293 Mass. 93, 94; *Gates's Case*, 297 Mass. 178, 181), the evidence in the instant case does not warrant findings that the representative of the city, the supervisor, had full direction and control of the deceased and that the latter owed obedience to him in the work in which he was engaged.

We are of opinion that the evidence in the present case does not warrant findings that the control of the deceased in the work in which he was engaged was in other than the representative of the Federal government, to whom the deceased was accountable, and who hired him and who alone could discharge him in case he proved unfit for the

work assigned him by that official. See *Block* v. *Sassaman*, 26 Fed. Sup. 105, 107. It is the right to control rather than the exercise of it that is the test. *McDermott's Case*, 283 Mass. 74, 77. It follows from what has been said that the ultimate finding of the board in the present case, that at the time of his injury the deceased was an employee of the city, is not sustained by any of the evidence, and hence cannot stand.

The result we have reached finds support in cases decided in other jurisdictions. See *Hoover* v. *Independent School District of Shenandoah*, 220 Iowa, 1364; *State* v. *Nevada Industrial Commission*, 55 Nev. 343, and cases cited; *Shelton* v. *Greeneville*, 169 Tenn. 366; *Taylor* v. *Los Angeles*, 29 Cal. App. (2d) 181, 183; *South Dakota Employers Protective Association* v. *Poage*, 65 S. D. 198; *Manning* v. *State*, 123 Conn. 504, 507; *Los Angeles* v. *Industrial Commission*, 9 Cal. (2d) 705, 709. Compare *Sauk County* v. *Industrial Commission*, 225 Wis. 179.

In conclusion it is appropriate to point out that the claimant in the present case could have had relief under the emergency relief appropriation act of 1936, U. S. C. Sup. III, Title 15, § 728, extending the provisions of the Act of February 15, 1934 (48 U. S. Sts. at Large, 351), and relating to disability or death compensation and benefits to persons (except administrative employees qualifying as civil employees of the United States) employed and paid by the United States in those States in which the Federal relief administrator assumed control under § 3 (b) of the Federal emergency relief act of 1933. This act also provides that "such compensation shall be limited to fatal cases and permanent partial and permanent total disability cases where claim is filed within one year from the date of enactment of this Act"; and that the provisions just set forth "shall not apply in any case coming within the purview of the workmen's compensation law of any State or Territory, or in which the claimant has received or is entitled to receive similar benefits for injury or death." While this act was not enacted until June 22, 1936, and the injury to the deceased in the present case occurred on February 9, 1935, it

will be seen that under the terms of the act the claimant could have made application for relief thereunder within the period of one year from the date of its enactment.

The decree entered in the Superior Court is reversed and instead a decree is to be entered dismissing the application of the claimant.

*So ordered.*